### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

_____

| | | |
|---|---|---|
| KENNETH KIDWELL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 09-CV-2179** |
| | ) | |
| JOSEPH S. EISENHAUER, LARRY | ) | |
| THOMASON, DOUG MILLER and | ) | |
| BOB RICHARD, | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#17) filed by

Defendants Joseph S. Eisenhauer, Larry Thomason, Doug Miller and Bob Richard.  This court has

carefully reviewed the arguments of the parties and the documents filed by the parties.  Following

this careful and thorough review, Defendants' Motion for Summary Judgment (#17) is GRANTED.

### FACTS[1]

Plaintiff was hired by the City of Danville Police Department (Department) in December

1992.  He was promoted to the position of sergeant in 1996.  On January 1, 2006, Plaintiff was

assigned to be the supervisor of the Community Oriented Policing Service (COPS) unit.  This was

not a full-time assignment and Plaintiff's primary function was still to supervise the second shift

patrol. In March 2007, Defendant Doug Miller, who was Deputy Director of the Department's

criminal investigations division, received a telephone call from an anonymous source informing him

that some local Danville gang members were planning a "hit" on two Danville police officers.  As

---

[1]  The facts are taken from the parties' statements of undisputed facts and the documents submitted by the parties, including the transcripts of deposition testimony and the transcripts of the arbitration hearing held regarding the termination of Plaintiff's employment.  This court has only included facts which are adequately supported by evidence in the record.

part of his special assignment as supervisor of the COPS unit, Plaintiff played a role in the investigation of the threat. After the next several weeks, Plaintiff did not feel the Department was doing any follow-up investigation, so he and the other members of the COPS unit took primary responsibility to continue to look into it.

During his work on the investigation, Plaintiff developed a relationship with Don Neal, who he considered a source of information. Neal was a gang member, or familiar with gangs, and is a convicted felon, with nearly 20 arrests and five convictions on his "rap" sheet. Neal was arrested in November 2007. On December 4 and 5, 2007, Plaintiff talked to Vermilion County State's Attorney Frank Young and assistant State's Attorney Larry Mills about getting Neal's bond reduced so Plaintiff could continue to work with him on the "hit" investigation. On December 21, 2007, Plaintiff met with Young. Young told him that Judge Claudia Anderson had refused to lower Neal's bond. On December 28, 2007, Plaintiff and Officer Hannan, a member of the COPS unit, went to Judge Anderson's office to meet with her. Judge Anderson told them that Young had never requested a bond reduction. Mills was then called and asked to come to Judge Anderson's office. After Mills arrived, Plaintiff told Judge Anderson that Neal was going to assist him and Officer Hannan in investigating the planned "hit" and they would like Neal's bond reduced. Judge Anderson agreed to reduce the bond amount.

Miller received information about Plaintiff's interaction with Judge Anderson and discussed the matter with Mills. Defendant Larry Thomason, who was Director of the Danville Public Safety Department (and had all of duties of a Chief of Police), also heard about the incident and discussed it with Young. Young advised Thomason that he was upset about the conduct of Plaintiff and Hannan. Thomason decided to submit the incident to the Internal Affairs Unit to determine if

Plaintiff had violated any of the Department's Rules and Regulations. Miller and Defendant Bob Richard, Deputy Director of the Department's patrol division, were involved in the investigation. They concluded that Plaintiff did not violate any existing rules or regulations of the Department. However, Thomason then amended the rules and regulations to prohibit any direct contact between officers and a Judge regarding pending criminal cases.

Plaintiff was part of the patrol division. In January 2008, Richard told Plaintiff to keep him informed regarding his investigation. Richard told Plaintiff that, as the head of the patrol division, he needed to know what Plaintiff was doing. On February 7, 2008, Plaintiff gave Richard three binders of materials concerning his investigation. After reviewing the materials and learning that Plaintiff and Neal were contemplating the use of a "wire" in further investigation, Richard formed the opinion that the investigation exceeded the capability of the Department.

On February 11, 2008, Plaintiff and Officer Hannan made a joint presentation at a meeting of the Police Benevolent and Protective Association (union). They expressed that they did not feel like they were getting the support of the upper command on their investigation and explained that they thought that command had dropped the ball. Plaintiff brought up the topic of a "no confidence" vote against the Department's administration and Defendant Joseph S. Eisenhauer, the Mayor of Danville. Plaintiff also said that Young and Mills had lied to him regarding requesting a bond reduction for Neal.

On February 21, 2008, Miller and Richard met with assistant United States Attorney Eugene Miller and requested both a review of the "hit" case and a recommendation as to which federal law enforcement agency would be best suited to handle any further investigation. The investigation was turned over to the Federal Bureau of Investigation (FBI), and Plaintiff occasionally spent time

working with FBI agents regarding the "hit" case as well as a corruption investigation of Larry Mills.          On March 22, 2008, Plaintiff was called by an acquaintance, Alan Dixon. Dixon requested an "officer standby" while he collected some personal property in a residence. Plaintiff stood by while Dixon entered the residence, but the guns and gun safe he wanted to retrieve were not there. Later, Lisa Dixon complained that she was going through a divorce with Dixon's son and Dixon did not have authority to enter her home or retrieve any belongings. Lisa Dixon complained on several occasions to Mayor Eisenhauer and eventually contacted WCIA 3 News in Champaign, Illinois. Richard conducted an informal inquiry, speaking to Plaintiff about what had occurred. After speaking with Plaintiff, Richard determined that Plaintiff had done nothing wrong. At his deposition, Plaintiff testified that he was upset because Mayor Eisenhauer's responses to Lisa Dixon talked about an investigation and the television news report mentioned an investigation. Plaintiff felt that the references to an investigation made it appear that he had done something wrong.

On April 2, 2008, an incident occurred at the Public Safety Building. Plaintiff asked Richard in a loud voice, "Why are you headhunting him?" referring to Officer Tony Piatt. Richard was investigating Piatt because of an allegation that Piatt put a gun to a gang member's head after the gang member blew a kiss to Piatt's wife. At the time Plaintiff asked the question, Piatt was standing a few feet away within earshot. Plaintiff testified at his deposition that he did not know Piatt was within earshot when he made the comment and, if he had known, he "probably would have said it lower so [Piatt] wouldn't have heard it." Plaintiff testified that, in hindsight, he would not have said it at all if he had to go back and do it all over again. Plaintiff acknowledged that "Richard concluded it was a disparaging comment to accuse him of being a headhunter." On April 15, 2008, Richard issued Plaintiff a "Written Reprimand at Division Level" for his conduct on April 2, 2008. Richard

determined that the comment was a violation of the Department's rules and regulations which prohibit "making any statement or allusion which discredits or disparages any member except when reporting a member's misconduct to a supervisor."

Later in April 2008, Richard advised Plaintiff that he had to give the Department 48-hour notice before he worked with an outside agency, such as the FBI, because of scheduling concerns. Also in April 2008, Richard received information that Plaintiff was meeting with informants or sources of information, while on duty, in his personal vehicle, without letting anyone in the Department know. Richard did not want Plaintiff meeting with these types of people without letting someone know because he did not think it was safe. Based upon these concerns, Richard instructed John Miller, Plaintiff's immediate supervisor, to meet with Plaintiff and tell him that they wanted him to follow procedures. On May 1, 2008, John Miller informed Plaintiff that he was not to meet with informants alone.

On May 23, 2008, Richard informed Plaintiff that the COPS unit was being transferred from his command. A decision was made to combine the COPS unit with the Problem Oriented Policing (POP) unit, which had been set up by the Department in June 2007. Thomason testified that he began thinking about combining the COPS and POP programs at the time the POP program was established in order to maximize efficiency. There were issues which needed to be worked out but Thomason eventually made the decision to combine the units. Thomason also decided to have the combined units under investigations rather than under patrol because both units were assisting detectives and sharing information. Therefore, Sergeant Thompson, who had been supervising the POP Unit, was selected to supervise the combined units. On June 25, 2008, Plaintiff was ordered to turn in his cell phone. Richard stated in his affidavit that he ordered Plaintiff to turn in his

department issued cell phone because that phone had been assigned to him as part of his special assignment in the COPS unit, and the COPS unit had been absorbed into the POP unit in the investigations division. At the time Plaintiff was directed to turn in the cell phone, no other sergeant in the patrol division was assigned a cell phone unless he or she was on a special assignment.

On July 5, 2008, Plaintiff filed a grievance concerning the command officers' taking the day off on the July 4th holiday. Under the contract, Step 1 of the grievance process is "meet with an immediate supervisor." Plaintiff did not have a meeting with his immediate supervisor, John Miller, about his grievance. Instead, Plaintiff received a written response that was signed by John Miller, but was written by Richard. Richard responded because he felt he was well-informed regarding the issue because he had been on the negotiation committee when the benefit at issue was negotiated. Richard felt that, by writing the Step 1 response personally, he could achieve the goal of having consistent responses to grievances and avoid having conflicting responses written by the Commanders.

On August 8, 2008, Plaintiff attended a union meeting and asked that Richard be removed from the Association. Plaintiff outlined instances where he felt Richard was acting contrary to the aims and policies of the police union. Plaintiff also discussed his belief that Richard meddled or interfered with his July 5, 2008 grievance and testified this was the "final straw" that caused him to ask that Richard be removed from the union. According to Richard, a vote was taken and he was not removed from the union.

On August 26, 2008, Plaintiff received a call from Neal. Neal informed Plaintiff that he was in Chicago and in possession of an explosive device. Neal asked Plaintiff to drive to Chicago so he could turn the device over to Plaintiff. Plaintiff traveled to Chicago with a civilian, Denny Davis,

and took possession of the device. Plaintiff and Davis then transported the device back to Danville. On August 27, 2008, Richard was coming out of the Public Safety Building and Plaintiff walked up to him and told him there was an "explosive device" in his car. Richard told Plaintiff to contact the University of Illinois Bomb Squad. At his deposition, Plaintiff referred to "going to Chicago and getting that explosive device," but also testified that it was not a bomb, it was a "three-inch titanium salute," which was a piece of a firework.

Richard informed Thomason that Plaintiff had come onto the property at the Public Safety Building and advised he had an explosive device in his vehicle. After the reports about the incident were complete, Thomason was very concerned and requested a meeting with Plaintiff to discuss Plaintiff's actions concerning the trip to Chicago. Thomason told Plaintiff he had concerns about Plaintiff going to Chicago to get an explosive device. He expressed concern that Plaintiff had taken a civilian along, possibly endangering the civilian's life. Thomason also expressed the concern that transporting the explosive device back to Danville could have endangered others driving on the streets. In addition, Thomason addressed his concern that Plaintiff went to Chicago, another jurisdiction, where he did not have authority to work a case, without having made full contact with the Chicago Police Department.

Thomason did not conduct any further investigation regarding this issue because there was no dispute about what happened. Thomason determined that Plaintiff's conduct was in violation of the rules, including the rules prohibiting taking action where the Department did not have original jurisdiction in accordance with State statutes and the rule requiring Plaintiff to keep his supervisors informed of his intent to take police action in another jurisdiction while he was off duty. On September 17, 2008, Thomason made the decision to suspend Plaintiff for two days for the rule

violations.

Also on September 17, 2008, Plaintiff made another unauthorized trip out of the Department's jurisdiction by transporting Neal to Burlington, Iowa. Thomason received a call from John Miller regarding the incident. John Miller said that he had received a call from Burlington, Iowa about a "Detective" Kidwell having been in Burlington investigating a case. John Miller told Plaintiff to notify Thomason regarding what he had been doing in Burlington. In addition, Richard received a telephone call from Lieutenant Kramer of the Burlington Police Department. Kramer asked Richard if they had a "Kidwell" working and if he had been authorized to go to Iowa to do an investigation. Lieutenant Kramer explained that Plaintiff went to a gas station where a supposed shooting had taken place, showed his Danville ID card, asked questions, and inquired about possible videotapes. Lieutenant Kramer told Richard that Plaintiff's conduct could be considered interfering with an active investigation, and if he continued, they would possibly seek criminal charges against Plaintiff. Richard prepared a memorandum to Thomason summarizing this conversation.

Thomason spoke briefly with Plaintiff about what took place. Plaintiff acknowledged having been in Burlington with Neal, a convicted felon. He also acknowledged that he had taken some photographs at a crime scene. However, Plaintiff denied that he was investigating a case. At his deposition, Plaintiff testified that Neal had been shot in Burlington on August 31, 2008. Plaintiff testified that he took Neal to Burlington on September 17, 2008, to get treated for his injuries. Plaintiff testified that, once they got to Burlington, he asked Neal to show him the gas station where he was shot. While they were there, Plaintiff suggesting getting pictures in case Neal wanted to file a civil lawsuit against the "people or person" who shot him. Plaintiff testified that he then bought a camera and took some pictures. He also made inquiries at the gas station regarding a video tape

of the day of the shooting.

Thomason testified that he believes that Plaintiff violated Department policy by representing himself as a member of the Department and implying that he was doing an investigation at the crime scene in Burlington. Thomason also believes that Plaintiff violated Department policy by failing to contact the Burlington Police Department to let them know that he was there doing police work in the jurisdiction. In addition, Thomason believes that Plaintiff violated Department policy by fraternizing with convicted felons, and particularly, transporting a felon to Iowa.

On September 21, 2008, Plaintiff was involved in a motor vehicle accident while on duty. Plaintiff was involved in a pursuit, along with other officers, and was making a three point turn in the highway. A squad care driven by Officer Moody crashed into his car. Both Plaintiff and Moody were injured by the heavy side impact of Moody's vehicle into Plaintiff's vehicle. Following the collision, Thomason arrived on the scene. Thomason spoke to Detective Stark, who was off duty at the time but had happened to witness part of the pursuit which led to the collision. After speaking to Stark, Thomason made the decision to have Stark investigate the accident. Thomason decided to have Stark investigate, rather than request an investigation by the Vermilion County Sheriff's Department or the Illinois State Police because there was no death involved, the two main vehicles involved in the collision were police vehicles and no private person suffered any injuries. The Vehicle Accident Damage Review Committee (Committee), consisting of one command officer and four to five other members of the Department, determined that the accident was chargeable to Plaintiff.

Plaintiff was off work because of the injuries he sustained in the accident. Thomason received a medical evaluation on December 5, 2008, which stated that Plaintiff was released for light

duty. Based upon his personal physician's recommendation, Plaintiff did not think that he should be returned to light duty yet and decided not to take the light duty assignment. On December 6, 2008, Richard gave Plaintiff the option of returning to duty or using sick time. Plaintiff decided that, because he had not been cleared by his own doctor, he would choose sick time.

On January 12, 2009, Plaintiff provided John Miller with a memorandum informing the Department that he was taking medications known as Lexapro and Abilify. Department policy required officers to disclose to their supervisors that they are taking medication. In fact, Plaintiff began taking Lexapro in 2007 and Abilify in November 2008 in order to treat obsessive compulsive disorder. Plaintiff did not notify any of his supervisors that he was taking these medications before January 12, 2009. Thomason testified that he is not aware of any other individuals in the Department taking antidepressant medications. On January 26, 2009, Thomason ordered Plaintiff to report to the Institute for Public Safety Personnel, Inc. in Indianapolis, Indiana to submit to a fitness for duty evaluation. The written order given to Plaintiff by Thomason stated that the reasons for the order were: (1) Plaintiff's increasingly changed behavior over the last year, including, but not limited to, persistent refusals to comply with directives and/or meet Departmental expectations; and (2) Plaintiff's disclosure of his intake of Lexapro and Abilify. Thomason also informed Plaintiff that another reason for the evaluation was that Plaintiff was a supervisor and the Department needed to know if he could perform in that capacity.

On January 30, 2009, Thomason made the decision to put Plaintiff on paid administrative leave pending the outcome of the fitness for duty evaluation. After conducting the fitness for duty evaluation, Dr. Darren Higginbotham called Thomason and advised that he was issuing an unfit-for-duty report. Plaintiff was then placed on leave for non-duty related illness. In May 2009, Thomason

ordered Plaintiff to attend a second fitness for duty evaluation to be performed by Dr. Michael Campion. Plaintiff could not return to work until he was found fit for duty. Plaintiff initially signed a release of information regarding the second evaluation but later withdrew his permission to release the report to the Department. According to Plaintiff, he withdrew his permission before the evaluation was performed. Dr. Campion conducted an evaluation on May 29, 2009, the results of which were never released to the Department.

On September 14, 2009, Thomason filed charges against Plaintiff seeking his termination. The statement of charges included three charges against Plaintiff: (1) Plaintiff was insubordinate in refusing to release Dr. Campion's evaluation to the City; (2) Plaintiff violated numerous Police Division Rules and Regulations during his September 17, 2008 trip to Burlington, Iowa; and (3) Plaintiff violated several Rules and Regulations of the Department during his involvement with the vehicular pursuit of a suspect and vehicle accident on September 21, 2008.

On September 25, 2009, the union filed a grievance challenging the termination of Plaintiff's employment. A hearing was held before an arbitrator on February 26, 2010, and June 3, 2010. The arbitrator issued a lengthy decision in February 2011. The arbitrator determined that the Department improperly insisted that Plaintiff sign a release for "all" the records associated with his psychological evaluation. The arbitrator therefore concluded that Plaintiff was within his rights when he revoked the release he had signed because the Department's release violated his mental health privacy rights. The arbitrator concluded that Plaintiff "took steps to protect the confidentiality rights guaranteed as a police officer under Illinois law" and concluded that no discipline was warranted based upon Plaintiff's refusal to sign a consent form releasing the results of his evaluation. The arbitrator also found that there was no real dispute that Plaintiff was

responsible for the September 21, 2008, accident and that "the surrounding facts indicate that [Plaintiff] was conducting an investigation of the type he would normally conduct as a police officer" when he went to Burlington, Iowa on September 17, 2008. The arbitrator concluded that the Department did not err in imposing discipline based upon the substantiated charges involving the accident and the Burlington incident. The arbitrator concluded, however, that termination was too severe for Plaintiff's conduct. The arbitrator concluded that a seven-day suspension would be sufficient for Plaintiff's conduct. The arbitrator ordered Plaintiff to be reinstated but said that Plaintiff's "continued employment will be conditioned . . . upon his providing the results of a current fitness for duty evaluation to the City within a reasonable period of time."

## PROCEDURAL HISTORY

On July 24, 2009, Plaintiff filed a Complaint (#1) against Defendants. Plaintiff stated that his claims were brought pursuant to 42 U.S.C. § 1983. Plaintiff specifically alleged that he was retaliated against for exercising his rights under the First Amendment to the United States Constitution. He alleged that he spoke out at a union meeting on February 11, 2008, and thereafter suffered retaliation. Plaintiff alleged that he spoke out a union meeting on August 18, 2008, and again suffered retaliation. On October 20, 2009, Defendants filed their Answer and Affirmative Defenses (#8).

On December 30, 2010, Defendants filed a Motion for Summary Judgment (#17) with attached supporting Exhibits. Defendants argued that, based upon the evidence and the applicable case law, they are entitled to judgment as a matter of law on Plaintiff's First Amendment claims. Defendants argued that the undisputed record in this case reveals that Plaintiff cannot come forth with evidence to demonstrate that any of the allegedly retaliatory acts would not have been taken

"but for" Plaintiff's protected speech. Defendants argued that, most notably, each allegedly retaliatory act was taken for legitimate, non-retaliatory reasons, and the record is bereft of circumstantial evidence which could lead to a reasonable inference that Defendants' proffered explanations for their actions are pretextual.[2]

After being allowed three extensions of time, Plaintiff filed his Memorandum of Law in Opposition to Summary Judgment (#21) on February 25, 2011. Plaintiff also attached supporting Exhibits consisting of transcripts of the hearing before the arbitrator and the arbitrator's decision. On March 14, 2011, Defendants filed their Reply (#23).

## ANALYSIS

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Singer v.

---

[2] Defendants have also argued, at length, that they are entitled to summary judgment based upon qualified immunity and that Plaintiff does not have evidence that certain Defendants were personally involved in certain actions. This court agrees with Plaintiff, however, that the only issue this court must concern itself with is whether there is sufficient evidence in the record to show that Plaintiff's speech caused the actions he maintains are retaliatory. Plaintiff is correct that if there is insufficient evidence to present this question to a jury, Plaintiff's "claim is doomed." Because this court has concluded that the evidence is insufficient to present the case to a jury, as will be thoroughly discussed below, this court does not need to address Defendants' other arguments.

13

Raemisch, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor toward the nonmoving party

does not extend to drawing inferences which are only supported by speculation or conjecture.  See

Singer, 593 F.3d at 533.  In addition, this court "need not accept as true a plaintiff's *characterization*

of the facts or a plaintiff's legal conclusion." Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258,

688 F. Supp. 2d 815, 835 (C.D. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the

pleadings.  Waldridge, 24 F.3d at 920.  "[I]nstead, the nonmovant must present definite, competent

evidence in rebuttal."  Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what

evidence it has that would convince a trier of fact to accept its version of events."  Koszola v. Bd.

of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting Johnson v. Cambridge

Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003).  Specifically, to survive summary judgment, the

nonmoving party "must make a sufficient showing of evidence for each essential element of its case

on which it bears the burden at trial."  Kampmier v. Emeritus Corp., 472 F.3d 930, 936 (7th Cir.

2007), citing Celotex Corp., 477 U.S. at 322-23.[3]

---

[3]  This court notes that the first three pages of the argument section in Plaintiff's
Memorandum of Law in Opposition to Summary Judgment (#21) consists of what Defendants
correctly call a "diatribe" attacking the current state of the law regarding motions for summary
judgment.  This section of argument is entitled "Summary Judgment Standards have Become
Abusive of Plaintiffs in Civil Rights claims."  Plaintiff's argument ends with the statement that
"[t]he seemingly instinctive trend of granting judgment in employment cases must be reversed"
and appears to be a request that this court reject the standards set out by the United States
Supreme Court and the Seventh Circuit regarding motions for summary judgment.  This court
must, however, follow the decisions of the United States Supreme Court and the Seventh Circuit.
"In a hierarchical system, decisions of a superior court are authoritative on inferior courts."
Reiser v. Residential Funding Corp. 380 F.3d 1027, 1029 (7th Cir. 2004); see also Greeno v.
Daley, 414 F.3d 645, 656 (7th Cir. 2005).  Therefore, this court must follow those decisions
whether or not it agrees.  See Reiser, 380 F.3d at 1029.  This court believes that Defendant has a
good point when it noted that the placement of this argument as Plaintiff's lead argument
"reveals much about the evidentiary strength of his case."

## PLAINTIFF'S CLAIMS

In his Response to the Motion for Summary Judgment, Plaintiff argued that summary judgment is not appropriate in this case because there is circumstantial evidence to suggest that Plaintiff's statements to the union were the reason for the actions taken against him. Plaintiff argued that the timing of events is highly suspect because he had been a highly thought of employee before he spoke to the union and, after that fact, his downfall was quite rapid. Plaintiff argued that there are genuine disputes of material fact regarding whether the following actions were taken in retaliation for his statements to the union in February and August of 2008: (1) written reprimand on April 15, 2008; (2) the restrictions he received later in April 2008, unique to him, that he had to notify superiors before meeting with informants; (3) his COPS assignment was ended in June 2008; (4) he received a two-day suspension in September 2008; and (5) following his car accident on September 21, 2008, he never returned to work. Plaintiff argued that, in addition to the suspicious timing, he has also shown that Defendants departed from the Department's own internal policies in imposing discipline on Plaintiff, constituting circumstantial evidence of retaliation. Plaintiff specifically pointed to Defendants' failure to provide procedural safeguards to Plaintiff and failure to follow internal rules that provide that automobile accidents that cause injury or damage to property are to be investigated by an outside law enforcement agency. Plaintiff also pointed to Defendants' request that Plaintiff sign a release for all of the records of his mental health evaluation when the Department was only entitled to the release of the ultimate determination of whether an officer is fit for duty.

This court agrees with Defendants that the undisputed facts in this case establish that the discipline imposed on Plaintiff was reasonable and based upon his actions, not his speech. Evidence

regarding timing and the procedures used are not enough to raise a genuine dispute of material fact regarding whether the actions were taken in retaliation for his speech.

"The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits a public employer from retaliating against an employee for engaging in protected speech." Milwaukee Deputy Sheriff's Ass'n v. Clarke, 574 F.3d 370, 376 (7th Cir. 2009). "To make out a *prima facie* claim for a violation of First Amendment rights, public employees must present evidence that (1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech caused the employer's action." Gunville v. Walker, 583 F.3d 979, 983-84 (7th Cir. 2009). In this case, Defendants have not disputed that Plaintiff may be able to show that his speech at the union meetings was constitutionally protected and may be able to show that the employment actions taken against him may be of the type "likely to deter speech." Defendants claim, however, that the undisputed evidence fails to create a reasonable inference that Plaintiff's speech caused Defendants' actions.

Defendants are correct that Plaintiff has the burden to establish, by a preponderance of the evidence, that protected speech was the but-for cause of the alleged retaliatory actions. See Gunville, 583 F.3d at 583-84. In Gunville, the Seventh Circuit noted that, prior to the decision of the United States Supreme Court in Gross v. FBL Fin. Servs., Inc., ____ U.S. ___, 129 S. Ct. 2343 (2009), "plaintiffs could prevail in a First Amendment § 1983 action if they could demonstrate that their speech was a motivating factor in the defendant's decision." Gunville, 583 F.3d at 984 n.1. After Gross, unless a federal statute provides otherwise, "the plaintiff bears the burden of demonstrating but-for causation in suits brought under federal law." Kodish v. Oakbrook Terrace Fire Prot. Dist., 604 F.3d 490, 501 (7th Cir. 2010); see also Gunville, 583 F.3d at 984 n.1.

16

A plaintiff may demonstrate that his First Amendment activity was the "but-for" cause of the Defendants' actions through either direct evidence or circumstantial evidence. See Mach v. Will County Sheriff, 580 F.3d 495, 498-99 (7th Cir. 2009). There is no dispute in this case that Plaintiff does not have direct evidence of retaliation which "essentially requires an admission by the decision maker that his actions were based on prohibited animus." See Massey v. Johnson, 457 F.3d 711, 717 (7th Cir. 2006), quoting Rogers v. City of Chicago, 320 F.3d 748. 753 (7th Cir. 2003). Plaintiff has argued, however, that there is enough circumstantial evidence of retaliation in this case for him to survive summary judgment. "Circumstantial evidence allows the finder of fact to infer that retaliatory animus motivated the decisionmaker to take an adverse employment action against the employee." Long v. Teachers' Retirement Sys. of Ill., 585 F.3d 344, 350 (7th Cir. 2009). "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." Long, 585 F.3d at 351. As far as suspicious timing, a plaintiff "may demonstrate improper motive with evidence that an adverse employment action took place on the heels of protected activity." See Samuelson v. LaPorte Community Sch. Corp., 526 F.3d 1046, 1053 (7th Cir. 2008). However, suspicious timing, standing alone, is rarely sufficient to create a triable issue. Argyropoulos v. City of Alton, 539 F.3d 724, 734 (7th Cir. 2008); see also Leonard v. E. Ill. Univ., 606 F.3d 428, 432-33 (7th Cir. 2010).

Based upon the time line of events in this case, which this court has carefully set out chronologically, this court concludes that there is no "suspicious timing" sufficient to constitute circumstantial evidence of retaliation based upon Plaintiff's speech. Plaintiff first spoke at a union meeting on February 11, 2008. The next event which occurred was Plaintiff's involvement in acting

as an "officer standby" on March 22, 2008. There were complaints made regarding Plaintiff's actions. In response, Richard spoke with Plaintiff and determined that Plaintiff had done nothing wrong. No disciplinary action was taken against Plaintiff, even though this incident occurred following Plaintiff's speech at the union meeting. Although Plaintiff testified that he was upset that the word "investigation" was used regarding the complaints against him, Plaintiff has not argued that this incident reflected any retaliation against him.

Plaintiff was not disciplined until April 15, 2008, based upon his actions on April 2, 2008. On April 2, 2008, Plaintiff asked Richard in a loud voice, "Why are you headhunting him?" in reference to Tony Piatt. Plaintiff testified at his deposition that he did not know Piatt was within earshot when he made the comment and, if he had known, he "probably would have said it lower so he wouldn't have heard it" and, in hindsight, he would not have said it at all. Plaintiff also acknowledged that Richard concluded it was a disparaging comment to accuse him of being a headhunter. This court concludes that the written reprimand issued on April 15, 2008, was based upon conduct which Plaintiff has not denied took place and was too remote in time to be considered related to Plaintiff's speech on February 11, 2008. See Argyropoulos, 539 F.3d at 734 (seven week gap between protected activity and allegedly adverse action insufficient to establish causation).

Plaintiff has also pointed to the restrictions he received later in April 2008 (actually May 1, 2008), which he argued were unique to him, that he had to notify superiors before meeting with informants. Plaintiff has not provided any evidence, however, that these restrictions were "unique to him." The evidence shows that these restriction were imposed for the purpose of Plaintiff's safety and there is no basis to conclude that they were imposed because of a retaliatory reason. Plaintiff also argued that the termination of his COPS assignment in June 2008 was in retaliation for his

speech on February 11, 2008. This court concludes, however, that Defendants have provided a detailed explanation for this decision and have provided evidence that this action was contemplated prior to Plaintiff's speech. In any case, this decision made four months after Plaintiff's speech is too remote in time to be considered made in retaliation for the speech. See Burks v. Wis. Dept. of Transp., 464 F.3d 744, 758-59 (7th Cir. 2006) (three-month gap between protected activity and allegedly adverse action insufficient to establish causation).

The evidence also shows that, after Plaintiff spoke at a union meeting on August 8, 2008, no action was taken against him until after Plaintiff engaged in conduct for which discipline was clearly justified. The undisputed evidence shows that, on August 26, 2008, Plaintiff made an unauthorized trip to Chicago with a civilian, Denny Davis, in his vehicle and brought back an explosive device. Thomas determined that a two-day suspension was warranted for this behavior, and Plaintiff has not and cannot show that this was not the case. In his Response, Plaintiff complained about Defendants' reference to an "explosive device" and argued that it was a "firework." However, Plaintiff himself told Richard he had an "explosive device" in his vehicle and, during his deposition, Plaintiff referred to "going to Chicago and getting that explosive device." This court agrees with Defendants that it is undisputed that Plaintiff drove from Danville to Chicago to retrieve a perceived explosive device without notifying his superiors or local law enforcement. The imposition of a two-day suspension was reasonable under these circumstances.

On September 17, 2008, the same day that Thomason imposed the two-day suspension for Plaintiff's trip to Chicago, Plaintiff made another unauthorized trip out of the jurisdiction. Plaintiff has insisted that he did not engage in police work or conduct an investigation in Burlington, Iowa. However, Plaintiff has not denied taking photographs at a crime scene and inquiring regarding the

existence of a videotape of the crime. This court concludes that, based on the evidence, Thomason reasonably concluded that Plaintiff, again, violated the Department's rules and regulations regarding activities outside of the jurisdiction. Four days later, on September 21, 2008, Plaintiff was involved in a automobile accident and was later found to be at fault. While he was on leave following the accident, Plaintiff belatedly notified his supervisor, John Miller, regarding the medications he had been taking since 2007 and November 2008 to treat obsessive compulsive disorder. Since that time, Plaintiff has not provided the Department with an evaluation which found that he was fit for duty.

Stated simply, the record firmly supports the conclusion that Defendants' actions regarding Plaintiff were justified based upon Plaintiff's conduct. See Samuelson, 526 F.3d at 1054. Defendants' actions did not come "on the heels of protected activity" but, instead, followed conduct by Plaintiff in violation of the rules and regulations of the Department. The fact that Plaintiff spoke at two union meetings does not mean that Defendants could not take actions regarding Plaintiff which were clearly warranted based upon Plaintiff's conduct. Therefore, there is no circumstantial evidence of "suspicious timing" in this case.

Plaintiff has also argued that Defendants' failure to follow procedures constitutes circumstantial evidence that their actions were in retaliation for Plaintiff's speech at the union meetings. This court does not agree. Plaintiff cannot complain that Defendants did not conduct adequate inquiries into his actions when there is no real dispute regarding those actions.[4] Moreover,

---

[4] This court recognizes that the arbitrator concluded that the Department's "failure to provide a thorough investigation raises serious questions about the Department's fairness in its treatment of [Plaintiff] and its motives in regard to his termination." However, the arbitrator also recognized that there was little dispute regarding the incidents leading to Plaintiff's termination. In addition, the arbitrator concluded that discipline was appropriate based upon Plaintiff's September 17, 2008 trip to Burlington, Iowa, and based upon the accident which occurred on September 21, 2008.

an inadequate or inept investigation does not establish discriminatory intent. See <u>Kariotis v. Navistar Int'l</u>, 131 F.3d 672, 678 (7th Cir. 1998). This court agrees with Defendants that Plaintiff was disciplined for conduct in which he admittedly engaged.

As far as the automobile accident, it is true that Rule 29.7.1 of the Danville Police Department Policy Manual states that "[w]henever a police vehicle is involved in a vehicle accident which involves death, serious injury, or major property damage, the on duty supervisor will request the accident to be investigated by either the Vermilion County Sheriff's Department or the Illinois State Police." In this case, Thomason determined that an investigation by the Vermilion County Sheriff's Department or the Illinois State Police was not necessary because the only persons injured were police officers, not civilians. Therefore, only an internal investigation was conducted. Following this investigation, it was determined that Plaintiff was at fault. This court agrees with Defendants that Plaintiff has not shown that this decision by Thomason was made with a retaliatory motive in order to achieve a desired result. Again, there is no real dispute regarding the accident and no reason to believe an investigation by a different entity would have resulted in anything but the same conclusion. This court notes that, following a hearing, the arbitrator concluded there was no real dispute that Plaintiff was responsible for the September 21, 2008, accident.

As far as the fitness evaluation issue, Plaintiff has not disputed that he cannot return to work until he has been found fit for duty. Relying heavily upon the arbitrator's decision on this issue, Plaintiff has complained that the Department required him to sign a release which was in violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act (Act), citing 740 Ill. Comp. Stat. 110 (West 2008). This court agrees with Defendants that, at worst, the record reflects a good faith dispute between Plaintiff and his attorneys and the Department and its attorneys

about the application of the Act to the fitness for duty evaluation. Defendants are also correct that the Illinois Supreme Court recently held that the Act does not apply to independent professionals whose sole function is to "make an evaluation" rather than "treat" the patient. See Johnson v. Weil, ___ N.E.2d ___, 2011 WL 681684, at *7-8 (Ill. February 25, 2011). In any case, there is no basis for a finding that the dispute in 2009 over Plaintiff's fitness evaluation had anything to do with his speech at union meetings in February and August of 2008.

In conclusion, this court concludes that Plaintiff has made no showing that there is a genuine dispute of material fact regarding whether his speech at the union meetings was the "but-for" cause of Defendants' actions. Defendants are entitled to summary judgment on all of Plaintiff's claims.

IT IS THEREFORE ORDERED THAT:

(1) The Motion for Summary Judgment (#17) filed by Defendants Joseph S. Eisenhauer, Larry Thomason, Doug Miller and Bob Richard is GRANTED. Judgment is entered in favor of Defendants and against Plaintiff on Plaintiff's Complaint (#1).

(2) This case is terminated.

ENTERED this 12th day of April, 2011

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE